# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| v. ) | Crim. No. 07-198 |
| ) | |
| JESUS GARCIA-GALLARDO and ) | |
| JOSE GARCIA-GALLARDO, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

On April 13, 2007, Trooper Thomas Yuhas, a seventeen year veteran with the Pennsylvania State Police ("PSP"), stopped a white passenger van with a California license plate which contained nineteen illegal Hispanic aliens. The stop occurred on the eastbound side of Interstate Highway I-70 in Washington County, Pennsylvania. These two defendants were indicted by a grand jury with having unlawfully reentered the United States after having been previously deported in violation of Title 8 U.S.C. § 1326.

The case comes before the Court on defendants' Motion to Suppress (Doc. 26) which alleges, at paragraph 8: "The stop of the suspect vehicle was conducted without probable cause or reasonable suspicion and violated the Defendants' rights under the Fourth Amendment to the United States Constitution. Moreover, the government cannot prove that the information provided to the authorities established probable cause or reasonable suspicion to stop the vehicle." Defendants also seek to suppress statements made at the time of the arrest on the grounds that they were the fruit of an unlawful arrest.

We disagree and will deny the motion.

1

We conducted a hearing on November 19, 2007, at which Trooper Yuhas and James Stitzel, a special agent with the Department of Homeland Security – Immigration Customs Enforcement ("ICE") agency, both testified. Agent Stitzel had been with ICE four years and had ten years prior experience with the federal government as an air Marshal and as an immigration inspector.

The Motion to Suppress was filed by Jesus Garcia-Gallardo. It was joined in by Jose Garcia-Gallardo. Jesus and Jose are brothers. Count One of the Indictment charges Jesus with having unlawfully reentered the country once after having been previously deported. Count Two charges Jose with having unlawfully reentered the U.S. after having been previously deported on five different occasions.

The facts established at the hearing are these.

On the morning of April 13, 2007, Agent Stitzel received a call from Special Agent Jeff Ryan in the Baltimore ICE office advising that he had been told by a reliable confidential informant ("CI") that a white passenger van carrying over ten passengers, and with a California license plate, was traveling east from California toward Baltimore on I-70. The CI said that at least some of the passengers were illegal aliens, having crossed the border from Mexico into the United States.

The CI reported that he/she had had several cell phone conversations with one of the passengers in the van as the van traveled across the country. According to Agent Stitzel the route of the van was able to be determined by means of locating the cell phone by "pinging", a method by which the cell phone connections are bounced off a control tower and on to a control station. The ICE agency in Baltimore had obtained a court order to enable it legally to trace the "pings."

2

Calls had come to the CI from several locations along the route, including Colorado and Kansas, the last being from Columbus, Ohio.

At the hearing it was unclear whether the van passenger knew he/she was giving information to a known CI, or whether the passenger was just talking to the CI as a friend or acquaintance. We did not ask that question at the hearing in order to protect the unidentified passenger from possible retaliation.

According to the CI some of the van passengers were to be dropped off in Baltimore on the night of April 13.

The passenger also informed the CI that a relative of the passenger had died en route, and her body was left in an area in Tucson, Arizona. Agent Stitzel testified that the body of an unidentified female had been found in Tucson. The cause of death was later determined to be from an acute diabetic episode.

On April 13, 2007, the Washington Barracks of the PSP were notified to exercise a "BOLO" on I-70. A "BOLO" is police jargon for "be on the look out" for someone or some thing. The object of the BOLO was the white van in question. Agent Ryan gave updates to Agent Stitzel throughout the day. Ryan was able to corroborate the CI's information through the cell phone data and the discovery of the body in Tucson.

At the beginning of his shift at 3:00 p.m., Trooper Yuhas was given this information and was ordered to go to I-70 and watch for the van. Around 4 p.m., from his center median vantage point, he spotted a white passenger van heading eastbound; the van had dark windows and a California license plate. The windows were so dark that he couldn't tell how many passengers were inside. He pulled his car to the left of the van and observed that the driver and front

3

passenger appeared to be Hispanic. He dropped his car behind the van, called for backup and followed the van for about five miles. By then two more PSP vehicles arrived, and they pulled the van over. Jose was the driver, and Jesus was in the front passenger seat. Both had California drivers licenses and there was a California registration card for the vehicle.

According to Trooper Yuhas the van was "packed" with people. As it turned out there were nineteen in all. Yuhas tried to ask some questions; all passengers had "blank looks" on their faces, and Jose said, "No English." Trooper Yuhas asked no further questions at that point.

Trooper Yuhas said that due to the unknown circumstances surrounding a possible homicide in Arizona he had been ordered to treat the van as a "crime scene."

One of the troopers drove the van back to the barracks with most of the passengers inside because it would have been dangerous to unload them all on the berm of a major interstate highway. Another agent from the Pittsburgh ICE office who spoke Spanish later determined that the passengers were from Guatemala, Mexico, and El Salvador.

As noted, Jesus and Jose have now been charged with unlawful reentry into the United States.

The issue before us is whether this was a lawful stop. We have no trouble finding that it was.

Defendants argue that the vehicle was stopped without "probable cause or reasonable suspicion" and that the information given to the authorities was insufficient to support such probable cause or reasonable suspicion.

There is no doubt that under the law enunciated by the United States Supreme Court the passengers were "seized" when the vehicle was stopped, and the passengers were therefore

4

entitled to Fourth Amendment protection. Brendlin v. California, 127 S.Ct. 2400 (2007); United States v. Johnson, 63 F.3d 242, 245 (3d Cir. 1995).

The facts leading up to the stop are not in dispute. The only issue is whether that information was sufficient and sufficiently reliable to justify the stop. The passenger in the van had several conversations with the CI in Baltimore, each of which were factually borne out by independent evidence. The cell phone "pings" established the direction and route of the vehicle. The passenger spoke of a relative who had died en route and how the body had been left in Tucson. ICE agent Stitzel learned that authorities in Arizona had recovered the body of an unidentified female in Tucson, not far from the Mexican border.

The passenger said the passengers in the van had crossed the border from Mexico. Before Trooper Yuhas stopped the van he noted that the driver (who turned out to be Jose) appeared to be Hispanic.

A traffic stop is constitutional if based on "articulable and reasonable suspicion that . . . either the vehicle or an occupant has violated the law." Delaware v. Prouse, 440 U.S. 648, 653 (1979).

The decision by an officer to make the stop is, of course, a rather subjective one, but it cannot be arbitrary.

Was the suspicion here articulable and reasonable? We hold that it was. Described by the Supreme Court, it is said to be a common sense, nontechnical concept that deals with the factual and practical considerations of "everyday life on which reasonable and prudent [people], not legal technicians, act." Ornelas v. U.S., 517 U.S. 690, 695 (1966). It is a less demanding standard than probable cause, also less than a preponderance of the evidence standard, but there

5

must be at least a minimal level of objective justification for making the stop. Illinois v. Wardlow, 528 U.S. 119, 123 (2000).

The principle may have been best described in United States v. Lenoir, 318 F.3d 725, 729 (7th Cir. 2003) where the court stated that reasonable suspicion is less than probable cause but more than a hunch.

Here the police certainly had information which was reasonably considered by them to be reliable as this drama unfolded. The van had the capacity to transport a number of passengers; the route of the van was traced by cell phone site, just as the passenger described; the body was found in Tucson corroborating information the passenger had given to the CI; the driver appeared to be Hispanic as described by the passenger. Trooper Yuhas had been ordered to treat the vehicle as a "crime scene" because of the death of the female in Tucson.

We hold that the police had reasonable suspicion that a crime or crimes had been committed, and therefore the motion to suppress must be denied.

AND NOW, to-wit, this 12th day of December, 2007, the Motion to Suppress (Doc. 26) be, and the same hereby is, DENIED.

Maurice B. Cohill, Jr.
Senior United States District Court Judge